IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.

BRET NAGGS, MARK WOGSLAND, and
PETER ARMBRUSTER,

        Defendants.

Case No. 18-CR-130

**MOTION TO DISMISS THE SUPERSEDING INDICTMENT
OR, IN THE ALTERNATIVE, FOR A *KASTIGAR* HEARING, TO SUPPRESS
GRAND JURY TESTIMONY, FOR DISCLOSURE OF GRAND JURY MATERIALS,
AND FOR LEAVE TO FILE SUPPLEMENTAL BRIEFING
AND ADDITIONAL PRE-TRIAL MOTIONS AS NECESSARY,
AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

Ryan S. Hedges
Junaid A. Zubairi
Jonathon P. Reinisch
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T: +1 312 609 7500
rhedges@vedderprice.com

Dated: October 18, 2019

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................ 1

II. FACTUAL BACKGROUND ...................................................................... 2

    A. Greenberg Traurig Begins To Conduct Roadrunner's Internal Investigation.................................................................................... 2

    B. The Government Directs Greenberg Traurig In Its Investigation......................... 3

    C. WilmerHale Takes the Lead On Roadrunner's Internal Investigation ................. 4

    D. At the Government's Request, Roadrunner's Counsel Suspends Witness Interviews and Provides Interview Downloads and Other Information To the Government To Use In Preparation For Employee Grand Jury Appearances ................................................................................ 5

    E. The Government Continues To Direct and Coordinate With Roadrunner's Counsel In Its Investigation ................................................... 9

    F. The Government Refuses To Provide Requested Discovery Relating To Its Coordinated Investigation With Roadrunner's Counsel ..................................... 11

III. ARGUMENT ............................................................................................ 13

    A. Relevant Legal Principles ................................................................. 13

    B. The Indictment Should be Dismissed Because Defendants' Fifth Amendment Rights Were Violated Under Garrity and Kastigar ......................... 14

        1. The Statements of Defendants Wogsland and Armbruster Were Compelled By Threat of Losing Their Jobs............................................. 16

        2. Roadrunner's Investigation Was Fairly Attributable to the Government................................................................................ 17

        3. The Government's Use of Tainted Testimony in the Grand Jury Warrants Dismissal ................................................................. 18

    C. The Indictment Should be Dismissed Based on Prosecutorial Misconduct ........ 19

    D. In the Alternative, Defendants Request a Kastigar Hearing, the Suppression of Mr. Wogsland's Grand Jury Testimony, and Early Disclosure of Grand Jury Material ................................................... 21

        1. Defendants Are Entitled to a Kastigar Hearing To Establish That the Government's Grand Jury Evidence was Tainted or Derived From Tainted Evidence .......................................................... 21

        2. The Court Should Suppress Mr. Wogsland's Grand Jury Testimony ........................................................................... 22

        3. The Court Should Order the Early Disclosure of All Grand Jury Material ........................................................................... 24

CHICAGO/#3366516

E.  Defendants Request Leave to Seek Future Relief Based on the Outcome of This Motion, a Kastigar Hearing, Defendants' Motion to Compel, and Ongoing Third Party Discovery ........................................................................... 25

IV.  CONCLUSION ............................................................................................................ 25

CHICAGO/#3366516

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Blum v. Yaretsky,*
457 U.S. 991 (1982)..................................................................................15, 17

*Garrity v. New Jersey,*
385 U.S. 493 (1967)................................................................14, 15, 16, 17, 19

*Natl'l Coll. Ath. Ass'n Tarkanian*
488 U.S. 179 (1988)..........................................................................................14

*U.S. v. Buske,*
2010 U.S. Dist. LEXIS 77010 (E.D. Wisc. 2010) .......................................19

*U.S. v. Connolly,*
2019 U.S. Dist. LEXIS 76233 (S.D.N.Y. 2019).............................13, 14, 17

*U.S. v. Conti,*
864 F.3d 63 (2d Cir. 2017)......................................................15, 18, 23, 24

*U.S. v. Cozzi,*
613 F.3d 725 (7th Cir. 2010) ..............................................................14, 22

*U.S. v. Harris,*
780 F. Supp. 385 (N.D.W.V. 1991) ....................................15, 18, 23, 24

*U.S. v. Hsia,*
131 F. Supp. 2d 195 (D.D.C. 2001) .............................................................23

*U.S. v. Hubbell,*
530 U.S. 27 (2000)............................................................................13, 22

*U.S. v. Jacobs,*
547 F.2d 772 (2d Cir. 1976)........................................................................19

*U.S. v. Kastigar,*
406 U.S. 441 460 (1972)...........................................2, 14, 19, 21, 22, 25

*U.S. v. Lawson,*
502 F. Supp. 158 (D. Md. 1980) ..........................................................20, 21

*U.S. v. Palumbo,*
897 F.2d 245 (7th Cir. 1990) .......................................................21, 22, 24

CHICAGO/#3366516

*U.S. v. Provenzano*,
    440 F. Supp. 561 (S.D.N.Y. 1977) .......................................................................20

*U.S. v. Samango*,
    607 F.2d 877 (9th Cir. 1980) ............................................................................20

*U.S. v. Stein*,
    435 F. Supp. 2d 330 (S.D.N.Y. 2006).............................................................14

*U.S. v. Stein*,
    440 F. Supp. 2d 315 (S.D.N.Y. 2006).......................................................14, 16

*U.S. v. Stein*,
    541 F.3d 130 (2d Cir. 2008).............................................................................15

*U.S. v. Weiss*,
    1982 U.S. Dist. LEXIS 14395 (S.D.N.Y. 1982).................................................7

*U.S. v. Zielezinksi*,
    740 F.2d 727 (9th Cir. 1984) ............................................................................22

## Other Authorities

Federal Rule of Criminal Procedure 12(b)(3)(A)(v)....................................................13

Federal Rule of Criminal Procedure 12(b)(3)(C)........................................................22

Local Rule 12(c)(3)....................................................................................................25

Local Rule 16(a)(3)....................................................................................................24

Local Rule 16(a)(4)....................................................................................................24

Local Rule 79(d)(5)......................................................................................................8

CHICAGO/#3366516

Defendant Mark Wogsland, by his undersigned counsel, submits this Motion to Dismiss the Superseding Indictment or, In the Alternative, For a *Kastigar* Hearing, To Suppress Grand Jury Testimony, For Disclosure of Grand Jury Materials, and For Leave to File Supplemental Briefing and Additional Pre-Trial Motions As Necessary, and Memorandum of Law In Support Thereof. Defendants Bret Naggs and Peter Armbruster have filed motions fully adopting and joining the arguments herein.

## I.    INTRODUCTION

This case is the latest example in the troubling and now-familiar trend of the Government overreaching in the investigation of a public company. Once again, under the threat of ruinous indictment, the Government has pressured a public company and its outside counsel to investigate the company's employees, to compel the employees to sit for interviews or lose their jobs, and to provide the employees' compelled statements to the Government for use in its investigation. When, as in this case, the Government uses the employees' compelled statements to seek an indictment of the employees, it does so in violation of the employees' due process rights under the Fifth Amendment of the Constitution and the indictment must be dismissed. When, as in this case, the Government *also* issues grand jury subpoenas to some of the same employees for whom it has obtained compelled statements from outside counsel's interviews, relies on the company's outside counsel to present the employees for sworn testimony, ignores the conflicts inherent in the multiple representations undertaken by company counsel, ***then seeks and obtains an indictment of one of the testifying employees, Defendant Mark Wogsland in this case***, the Government's violations of the Due Process Clause are beyond egregious. Defendants bring this motion seeking dismissal of the indictment for what appears to be an unprecedented misuse of the grand jury process and trampling of Defendants' Fifth Amendment rights.

1

If, however, the Court determines that dismissal is not warranted at this time, then Defendants seek four alternative forms of relief to begin to address the Government's misconduct. First, Defendants request a *Kastigar* hearing for the Court to hear evidence, determine the extent to which the Government's use of unconstitutional, compelled testimony tainted the Government's presentation to the grand jury, and decide whether dismissal of the indictment is appropriate. Second, Defendants ask the Court to suppress Mr. Wogsland's grand jury testimony and all evidence derived from it. Third, Defendants seek an order compelling disclosure of all grand jury materials. Finally, Defendants request leave to file any necessary supplemental briefing and additional pre-trial motions based on information obtained through ongoing discovery efforts and the requested *Kastigar* hearing.

## II.    FACTUAL BACKGROUND

Defendants are three former employees of Roadrunner Transportation Systems, Inc. ("Roadrunner"). In January of 2017, Roadrunner announced that it would restate its earnings reports for the preceding three years due to accounting errors. The following is a timeline of what transpired in the wake of that announcement.

### A.    Greenberg Traurig Begins To Conduct Roadrunner's Internal Investigation.

Roadrunner opened an internal investigation and, on January 30, 2017, the Board of Directors hired outside counsel Greenberg Traurig LLP to oversee the investigation. (Ex. A.) As part of its investigation, Greenberg Traurig began interviewing Roadrunner employees at least as early as February 21, 2017. (Ex. B.) All Roadrunner employees were expected to cooperate in the internal investigation or face termination. Specifically, the Roadrunner employee handbook provided in relevant part:

> **<u>Duty to Participate in Internal Investigations</u>**.  All Company employees must participate to the fullest extent possible in internal investigations when requested. Internal investigations include verbal inquiries as well as inspections of lockers or

2

inspections of your personal property on Company premises. Failure to fully participate in an internal investigation will result in discipline up to and including termination.

(Ex. C.) In total, Greenberg Traurig interviewed at least approximately 39 Roadrunner employees between February 21 and March 22, 2017, including Defendants Mark Wogsland (on February 22, 2017) and Peter Armbruster (on March 10, 2017). (Ex. B.)

**B.    The Government Directs Greenberg Traurig In Its Investigation.**

On February 28, 2017, the Government sent Roadrunner (via Greenberg Traurig) a grand jury subpoena for documents with a return date of March 14, 2017. (Ex. D.) The Government also sent a "deconfliction request" on the same day (February 28, 2017), stating, "[w]ith respect to both current and former employees, we [the Government] ask that prior to interviews (and in the case of former employees, prior to reaching out to former employees) you notify us in advance of your intentions."  (Ex. D.) The Government further sought copies of any documents that would be used by counsel in conducting those interviews. (Ex. D.)

On March 9, 2017, Greenberg Traurig responded and made its concerns very clear. Greenberg Traurig stated that it was "unable to agree" to the Government's request because it "would be inconsistent with the fiduciary duty of the [Roadrunner] Board of Directors" to conduct a thorough investigation, and "having to request approval from the DOJ before each [witness interview] relating to the matters at issue would unreasonably delay the internal investigation." (Ex. D.) Greenberg Traurig further noted that "the DOJ has provided no information concerning the benefits of agreeing to the deconfliction request," and that DOJ had declined to respond "when asked on the March 6 telephone call as to the consequences to [Roadrunner] . . . in denying the request."  (Ex. D.) Greenberg Traurig continued interviewing Roadrunner employees until March 22, 2017. (Ex. B.)

On or about March 20, 2017, less than two weeks after Greenberg Traurig advised the Government about its concerns with the deconfliction request, the Government, apparently unsatisfied with that response, issued a grand jury subpoena for the testimony of Roadrunner employee Chris Lacey, served by email to Greenberg Traurig. (Ex. E.) The subpoena required Mr. Lacey to appear and testify on April 11, 2017 before a grand jury sitting in the District of Washington, D.C. (Ex. E.)

This development appears to have caused Roadrunner's higher-level executives to seek separate, individual counsel. For example, on March 27, 2017, Roadrunner CEO Curt Stoelting sent an email advising that he was retaining "a personal SEC counsel" and that Roadrunner "provided Peter [Armbruster] with a number of attorney referrals with SEC and DOJ experience so that he can retain personal counsel." (Ex. F.) Defendant Wogsland, a mid-level director of accounting, was not provided the opportunity to obtain separate counsel at this time.

Defendants have been further informed that Greenberg Traurig had several additional substantive communications during the period February 2017 through July 2017, in which the Government directed Greenberg Traurig in the internal investigation at Roadrunner. For example, Defendants understand that on or about March 31, 2017, Greenberg Traurig met with the Government to discuss the methodology and procedures to be used in the internal investigation at Roadrunner, the parameters of the investigation, and potential limitations of the investigation.

### C. WilmerHale Takes the Lead On Roadrunner's Internal Investigation.

On March 20, 2017, Roadrunner held a telephonic meeting of the Audit Committee of the Board of Directors ("Audit Committee") that was attended in whole or in part by representatives of Roadrunner, the company's outside auditor Deloitte & Touche, LLP ("Deloitte"), outside audit firms RubinBrown LLP and Grant Thornton, LLP, and Greenberg Traurig. (Ex. G.) According to the minutes, an "extensive discussion" regarding the internal investigation and Deloitte's

determinations ensued, after which Greenberg Traurig's responsibilities in the internal investigation were diminished. Greenberg Traurig ceased interviewing Roadrunner employees immediately following that Board meeting and the Audit Committee retained Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") to replace Greenberg Traurig in the internal investigation. WilmerHale conducted all of the remaining employee interviews. (Ex. B.) Between April 25, 2017 and May 30, 2017, WilmerHale interviewed approximately 21 employees, including an interview of Mr. Wogsland (who still did not have separate counsel) on April 27, 2017. (Ex. B.)

### D. At the Government's Request, Roadrunner's Counsel Suspends Witness Interviews and Provides Interview Downloads and Other Information To the Government To Use In Preparation For Employee Grand Jury Appearances.

On June 12, 2017, Greenberg Traurig provided an update to Roadrunner's Board of Directors. Specifically, the Greenberg Traurig attorney stated that the firm's ongoing work included, among other things, "supporting WilmerHale in its continued investigation initiated by the Board's Audit Committee [and] prepping individuals for interviews with the grand jury." (Ex. H.) The Greenberg Traurig attorney also "summarized his communications with WilmerHale, [which] indicated that the DOJ had requested that all interviews related to the Company's internal investigation be suspended. The Board then asked questions and a lengthy discussion ensued." (Ex. H) At the same Board meeting, WilmerHale provided an update that included its "ongoing discussions with the DOJ and Deloitte." (Ex. H.)

WilmerHale abided by the Government's request to suspend additional employee interviews. In light of the Government's prior unsuccessful deconfliction request, it is reasonable to assume that the Government threatened Roadrunner's cooperation credit if counsel did not abide by the Government's direction to cease employee interviews until approved by the Government.

Incorporating Roadrunner's internal investigation up to that point into its own, the Government requested, and WilmerHale and Greenberg Traurig provided, "interview downloads"[1] of certain employees' compelled statements that the outside lawyers obtained during their investigation. During this time, it appears that WilmerHale and Greenberg Traurig provided these downloads of employees' compelled statements obtained during their interviews for the Government to use in preparing its examinations of certain witnesses subpoenaed to testify before the grand jury in Washington D.C.

For example, on July 10, 2017, Greenberg Traurig provided the Government a download of its prior interviews of Ben Kirkland (on March 8, 2017) and Andy Blanchard (on March 16, 2017). (Exs. I & J.) The next day, on July 11, 2017, Mr. Blanchard and Mr. Kirkland each testified before the grand jury. About a week later, on July 19, 2017, Greenberg Traurig provided the Government a download of its prior interviews of Sara Bowen (on February 22, 2017) and Bridget Smith (in mid-February 2017).[2] (Exs. K & L.) The next day, on July 20, 2017, Ms. Bowen and

---

[1] The Government created a summary memorandum of each interview download it received and has provided each memorandum to Defendants in discovery. However, the memoranda fail to disclose the attorney(s) who conducted the interview, whether the employee received an *Upjohn* warning during the interview, the date of the interview download to the Government, who provided the interview download to the Government, who was present for the Government at the download session, who prepared the Government's memorandum, or whether any information was omitted from the memorandum. The Defendants have asked the Government to provide this information, and the Government has refused. The Government has produced a total of approximately 100 interview downloads in discovery. Each interview download memorandum created and produced by the Government is similarly incomplete on its face. Defendants have filed an accompanying motion to compel the Government to disclose this and other information it obtained from Roadrunner's counsel regarding the company's internal investigations.

[2] On September 8, 2019, the Government provided a newly created "index" of interview downloads (Ex. B) that purports to show the date that each underlying witness interview occurred. That index states that Ms. Smith's interview occurred on March 6 or March 7, 2017, but the face of the interview download memorandum states that the interview occurred in "mid-February 2017." Defendants will assume the interview download memorandum, which likely was created at or around the time that the information was conveyed to the Government, is more accurate than the index created more than two years later.

6

Ms. Smith each testified before the grand jury. On July 27, 2017, WilmerHale provided the Government a download of its interview of Mr. Wogsland (on April 27, 2017). (Ex. M.)

Shockingly, the same Greenberg Traurig attorneys representing Roadrunner in its internal investigation represented each of the testifying employees in connection with their grand jury appearances, including Mr. Wogsland on September 12, 2017.[3] As the Government well knew, Greenberg's primary objective was to avoid the indictment of Roadrunner, and that placed Greenberg Traurig in an untenable conflict vis-à-vis representing Mr. Wogsland (and the other individuals) in connection with their grand jury testimony. The Government improperly disregarded these obvious conflicts because it wanted to obtain the fruits of the company's compelled employee interviews and other efforts to cooperate for use in the Government's investigation.[4]

---

[3] The Government had issued a grand jury subpoena for Mr. Wogsland's testimony, served by email to Greenberg Traurig. (Ex. N.) The subpoena commanded Mr. Wogsland to testify on June 6, 2017 in front of the grand jury sitting in the District of Washington, D.C. Greenberg Traurig negotiated with the Government concerning Mr. Wogsland's appearance date, which was extended multiple times and ultimately set for September 12, 2017. (*See* Ex. X.) Mr. Wogsland will testify that he never signed an engagement letter with Greenberg Traurig, he was never advised of any (actual or potential) conflict on the part of Greenberg Traurig in light of its multiple representations of Mr. Wogsland, Roadrunner and several other employees, and he never waived any such conflict.

[4] *See, e.g. U.S. v. Weiss*, 1982 U.S. Dist. LEXIS 14395, at *9-12 (S.D.N.Y. 1982) (holding that joint representation of a company and its employees was a conflict because the attorneys testified that "a public company [] could not take any position other than that of cooperating in a criminal investigation and therefore [the attorneys] advised the executives, while unaware of any allegations that they had defrauded the company, to cooperate fully in their grand jury testimony"); *see also id.* at *25 ("Where such a conflict creates a clear and present danger that multiple representation would prevent the grand jury witness from receiving the effective assistance of counsel, and where the government has knowledge of the conflict, . . . the government is under an ethical and legal obligation to seek judicial intervention prior to calling the witness to testify.").

CHICAGO/#3366516

For nearly seven hours, Mr. Wogsland testified in front of the grand jury in response to lengthy questions based on hypothetical and argumentative premises.[5] In many instances, it is impossible to ascertain to which part of the question Mr. Wogsland's response relates. *See, e.g.*, Ex. O at 67:8-72:16; 99:4-101:11; 102:1-105:23; 140:5-145:17; 246:8-254:14.

The day after Mr. Wogsland's September 12, 2017 testimony, attorneys for Greenberg Traurig contacted Mr. Wogsland and requested that he "put together [his] thoughts" from the questioning he received in the grand jury and send by email so that Greenberg Traurig could review before their call with the Government, scheduled for that afternoon. (Ex. P.) In a subsequent email, Greenberg Traurig specifically asked Mr. Wogsland to "include anything that the government asked" about a specific Roadrunner employee during Mr. Wogsland's testimony. (Ex. Q.)

The last Roadrunner employee to testify in the grand jury, Mr. McKay then testified on September 19, 2017. The Government has refused to disclose when it received the downloads of Greenberg Traurig's interviews of Mr. Wogsland (on February 22, 2017) and Pat McKay (on March 14, 2017[6] and May 5, 2017). On September 21, 2017, Mr. Wogsland and Mr. McKay were interviewed by WilmerHale, and according to the face of the Government's interview download memoranda, WilmerHale gave the Government an oral "download" of the contents of those interviews on September 25, and September 27, 2017, respectively. (Exs. R & S.)

---

[5] Pursuant to Local Rule 79(d)(5), Mr. Wogsland's grand jury transcript has been filed under seal so that the Court can see for itself how the interrogation of Mr. Wogsland was conducted by the Government. (Ex. O.)

[6] The interview download memorandum states that this interview occurred on March 14, 2017, but the Government's newly created index states that it occurred on March 4, 2017.

CHICAGO/#3366516

## E. The Government Continues To Direct and Coordinate With Roadrunner's Counsel In Its Investigation.

After taking this grand jury testimony, the Government returned to WilmerHale with a new direction for its coordinated investigation: the "double tracking" of more than 50 witness interviews. Specifically, between August 7, 2017 and November 10, 2017, WilmerHale appears to have interviewed only *current* Roadrunner employees, and downloaded those employees' interviews to the Government, while the Government conducted its own series of interviews of exclusively *former* or non-Roadrunner employees (whom the company and its lawyers did not control).[7] This "double tracking" allowed the Government to conserve its investigatory resources while still obtaining the employees' compelled interviews directly from WilmerHale. Particularly relevant, the Government obtained ***two additional compelled interviews of Mr. Wogsland during this period***, which the Government appears to have used against Mr. Wogsland to seek his indictment.

This was not by accident. Plainly, the Government used Roadrunner's counsel to interview Roadrunner's employees and report back because Roadrunner could more effectively compel its employees' testimony. And because former or non-Roadrunner employees cannot be coerced in the same way, they were prime candidates for the Government to interview directly (and generally without counsel present). When WilmerHale's internal investigation was completed on November 10, 2017, the Government almost immediately began conducting its own interviews of Roadrunner's current employees. But by then it was too late; the Government's investigation was

---

[7] Defendants understand that WilmerHale had regular calls with the Government (1) reporting on the substance of the interviews that WilmerHale had conducted that week, and (2) coordinating with the Government the scheduling of future interviews.

CHICAGO/#3366516

already tainted to the core by coerced testimony, and the Government's continuing interviews only served to spread the taint.

As WilmerHale worked its way up Roadrunner's corporate ladder seeking to interview key executives and Board members as directed by the Government, independent counsel who had been retained by those individuals were forcefully pushing back. For example, on October 18, 2017, counsel for Judy Vijums, former Roadrunner Board member, sent a letter to WilmerHale explaining that "the timing and scope of [the Audit Committee's] request, in conjunction with the conditions you have placed on the proposed interview – ***purportedly at the urging of the U.S. Department of Justice (DOJ)*** – make this approach untenable."  (Ex. T (emphasis added).) Also on October 18, 2017, counsel for Defendant Armbruster sent a similar letter, noting WilmerHale's "repeatedly stated intention to share [its] interview memoranda with both the US Department of Justice and the US Securities and Exchange Commission, both of which have opened investigations into RRTS." (Ex. U.) Then, on October 19, 2017, counsel for Scott Rued, former Roadrunner Board member, sent a similar letter to WilmerHale, stating bluntly:

> We also understand DOJ has informed the Audit Committee that it will calibrate how it exercises its prosecutorial discretion with respect to the company based in part on whether the Audit Committee allows DOJ to utilize the Audit Committee's investigation to further DOJ's investigation. Unfortunately, DOJ has overstepped its bounds by seeking to use a public company's restatement process as a vehicle to further DOJ's own investigation by pressuring Board members to relinquish their legal protections, including, without limitation, their rights to due process and effective assistance of counsel. . . . We understand that DOJ has asked the Audit Committee to demonstrate its cooperation with the DOJ by providing DOJ with the content of its interview with Mr. Rued (among others), and has instructed the Audit Committee to limit the documents and information that WilmerHale provides to Mr. Rued prior to the interview. We understand the Audit Committee intends to disclose everything that Mr. Rued says at his interview to DOJ and to specifically attribute the information to him. . . . In essence, you are asking Mr. Rued to sit for an interview with DOJ by the end of this week, without the information and materials needed to prepare for such an interview.

(Ex. V.) The letter deemed the Government's imposed conditions on WilmerHale's requested interview of Mr. Rued to be "unworkable." (Ex. V.)

As the coordinated interview campaign was winding down, Roadrunner CEO Curt Stoelting sent an email on October 27, 2017 to a large recipient group, advising: "the DOJ has indicated that they would like to interview additional company personnel. With the recent change in company counsel related to the investigation, the DOJ has indicated to our counsel at Drinker Biddle that they are comfortable doing interviews vs. grand jury testimony. We view this as a positive development." (Ex. W.) Beginning on November 16, 2017, Drinker Biddle attorneys presented dozens of current Roadrunner employees for interviews with the Government as part of the company's cooperation in the Government's investigation. No other employees were subpoenaed to testify before the grand jury.[8]

### F. The Government Refuses To Provide Requested Discovery Relating To Its Coordinated Investigation With Roadrunner's Counsel.

At this point, the Defendants' limited visibility into the Government's pre-indictment conduct becomes even more hampered by the Government's steadfast refusal to comply with nearly all of Defendants' specific discovery requests. Having apparently abandoned its grand jury proceeding in the District of Washington, D.C., the Government presented evidence to one or more grand juries in this District that returned the Indictment and then the Superseding Indictment.[9] But the Government has refused to provide any information about those grand jury proceedings, other than that the grand jury presentations apparently involved only testimony by law enforcement / summary witnesses. As explained below and in Defendants' accompanying Motion to Compel,

---

[8] This understanding is based on the Government's representation that it has produced in discovery all existing grand jury transcripts for all "fact witness" testimony, the last of which is dated September 20, 2017 (Mr. McKay).

[9] References to "Indictment" refer to both the original Indictment and the Superseding Indictment.

CHICAGO/#3366516

this information is crucial to the defense of this case and necessary to determine whether the Indictment is tainted by the improper use of Defendants' compelled testimony and testimony procured through gross abuse of the grand jury process in the District of Washington, D.C. Simply put, the Government's obstinance on these simple requests suggests that the Government may believe it has something to hide.

Making matters worse, purporting to comply with this District's "open file policy," the Government has inundated Defendants with a preposterous volume of discovery. To date, the Government has produced ***more than 9 million pages of documents, interview transcripts and downloads***, and additional documents continue to pour in.[10] Defendants are searching for proverbial needles in a haystack that could never be completely canvassed in any person's lifetime. The Government has placed this Herculean burden on the Defendants, while at the same time stonewalling Defendants' requests for simple information related to the Government's investigation and its interactions with Roadrunner's counsel in connection with same. The information requested by Defendants (such as, when did the interview downloads occur and who was present) is obviously in the Government's possession, but the Government refuses to provide it. These issues are addressed in Defendants' Motion to Compel filed concurrently herewith.

Nevertheless, the available information paints a fairly clear picture. The Government directed and controlled Roadrunner's internal investigations and used information obtained from Roadrunner's outside counsel, including compelled interviews of Defendants Wogsland and likely Armbruster, to charge them with crimes.[11] As set forth below, the Government's conduct violated

---

[10] The most recent production came on September 25, 2019 and contained another 25,590 pages.

[11] Mr. Naggs left the company on Nov. 5, 2015 and spoke to a Greenburg Traurig attorney via telephone on August 4, 2017. Accordingly, in joining this motion, Defendant Naggs does not contend that his own statement was compelled under threat of losing his job, as argued by the other Defendants in Section III(B)(1) of the Argument below. Although the Government has refused to

Defendants' Fifth Amendment rights. Accordingly, the Court should dismiss the Indictment or grant the alternative requested relief.

## III.     ARGUMENT

### A.     Relevant Legal Principles.

Defendants bring this Motion pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A)(v) to address defects in institution of the Government's prosecution of this case, specifically including "an error in the grand-jury proceeding." That error finds its footing in the Fifth Amendment, which provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "The privilege afforded [by the Fifth Amendment] not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *U.S. v. Hubbell*, 530 U.S. 27, 38 (2000).

These principles are taking on renewed importance as Courts have noticed a trend in the Government's reliance on employer interviews as a substitute for its own investigations. As one commentator has noted:

> [T]he government often will defer its interviews of the witnesses until after the corporate internal investigators can conduct their own interviews. Given the employees' fear of termination by their employer, the government knows that the corporation can be more effective in persuading its employees to speak than it could be, and the government knows all to [sic] well that it can then use its leverage over the company to compel the company to tell it what the employees say, even if that requires the waiver of the attorney-client privilege or work product doctrine.

*U.S. v. Connolly*, 2019 U.S. Dist. LEXIS 76233, at *33-34 (S.D.N.Y. 2019) (quoting Abbe David Lowell & Christopher D. Man, *Federalizing Corporate Internal Investigations and the Erosion of*

---

confirm on what date(s) it received the download of Mr. Armbruster's interview, in light of the evidence set forth herein, Defendants reasonably believe that Mr. Armbruster's compelled statements were provided to the Government before it sought the return of his indictment.

*Employees' Fifth Amendment Rights*, 40 Geo. L. J. Ann. Rev. Crim. Proc. xiii n.75 (2011)). The

Government also increasingly leans on corporate employers to conduct its investigations because

"the threat of [ruinous indictment] brings significant pressure to bear on corporations." *Id.* at *42

(quoting *Stein*, 541 F. 3d at 151)*; see also U.S. v. Stein*, 435 F. Supp. 2d 330, 382 n.234 (S.D.N.Y.

2006) (acknowledging that "the indictment of Arthur Andersen LLP resulted in the effective

demise of that large accounting firm . . . long before the case ever went to trial."). However, courts

recognize that "justice is not done when the government uses the threat of an indictment – a matter

of life and death to many companies and therefore a matter that threatens the jobs and security of

blameless employees – to coerce companies into depriving their present and even former

employees of the means of defending themselves against criminal charges." *Stein*, 435 F. Supp.

2d at 381-82. These principles are no better examined than under the facts of this case.

B.  **The Indictment Should be Dismissed Because Defendants' Fifth Amendment
    Rights Were Violated Under *Garrity* and *Kastigar*.**

Any statement that is the product of compulsion and attributable to the government must

be suppressed. *U.S. v. Stein*, 440 F. Supp. 2d 315, 326 (S.D.N.Y. 2006) (citing *Natl'l Coll. Ath.

Ass'n Tarkanian*, 488 U.S. 179, 191 (1988)). The Supreme Court has imposed a "total prohibition"

on the use of a defendant's compelled testimony and any evidence directly or indirectly derived

from it. *U.S. v. Kastigar*, 406 U.S. 441 460 (1972); *see also U.S. v. Cozzi*, 613 F.3d 725, 730 (7th

Cir. 2010) ("There is no question that *Kastigar* bars not only evidentiary use of compelled

testimony but also non-evidentiary, or derivative, use of the same."). Central to the analysis is

"how and by whom" a defendant's compelled statements are used, with particular focus on "the

prosecutor's use of compelled testimony." *Cozzi*, 613 F.3d at 730. The Government is barred from

using compelled testimony "as an investigatory lead" and "any evidence obtained by focusing

investigation on a witness as a result of his compelled disclosures." *Id.*

14

The Supreme Court held in *Garrity v. New Jersey*, 385 U.S. 493, 496-500 (1967) that statements obtained from police officers under fear of termination constituted compelled testimony in violation of the Fifth Amendment. Courts have since extended the *Garrity* holding to private conduct where the actions of a private employer are "fairly attributable to the government." *U.S. v. Stein*, 541 F.3d 130, 152 n.11 (2d Cir. 2008). That standard is satisfied where "there is a sufficiently close nexus between the State and the challenged action." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). A close nexus exists between the private employer and the government when the government: (1) exercises coercive power; (2) is entwined in the management or control of the private actor; (3) provides the private action with significant encouragement, either over or covert; (4) engages in a joint activity in which the private actor is a willful participant; (5) delegates a public function to the private actor; or (6) entwines the private actor in governmental policies. *Stein*, 541 F.3d at 147.

Dismissal of the indictment is necessary where tainted evidence was conveyed to the grand jury. *U.S. v. Conti*, 864 F.3d 63, 98 (2d Cir. 2017). In *Conti*, the Second Circuit found that "material parts of [the agent's] grand jury testimony derived exclusively from [the defendant's immunized testimony]" and held that dismissal of the indictment was necessary. *Id.* at 99-100; *see also U.S. v. Harris*, 780 F. Supp. 385, 393 (N.D.W.V. 1991) (dismissing before trial an indictment that was based on immunized/coerced testimony).

Similarly here, the Government's use of the compelled statements of Defendant Wogsland and likely Defendant Armbruster – tainted evidence obtained by actions of Roadrunner's counsel fairly attributable to the Government – to obtain the Indictment warrants dismissal.

CHICAGO/#3366516

1. **The Statements of Defendants Wogsland and Armbruster Were Compelled By Threat of Losing Their Jobs.**

"It no longer may be doubted that economic coercion to secure a waiver of the privilege against self-incrimination, where it is attributable to the government, violates the Fifth Amendment." *Stein*, 440 F. Supp. 2d at 326; *see also Garrity*, 385 U.S. at 500 ("The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent"). The economic coercion in this case was manifest. (*See* Section II, above.) Indeed, any reasonable employee would have interpreted the company's written policy and its statements through counsel as a threat of termination for noncooperation. Just like the state statute in *Garrity,* suggesting that police officers would lose their jobs for not answering questions, Roadrunner's company policy stating the same is sufficient to establish that the statements made by Mr. Wogsland, Mr. Armbruster, and other Roadrunner employees, in company interviews and grand jury testimony, were coerced.

Compounding the injury, Mr. Wogsland was then coerced to provide sworn testimony to a grand jury under the same threat of termination that caused him to give compelled testimony during Roadrunner's internal investigation in the first place. Mr. Wogsland was represented in the grand jury by Greenberg Traurig, who also represented Roadrunner and was at the time actively participating in the Government's and Roadrunner's "joint" investigation. By the time that Mr. Wogsland appeared before the grand jury, the taint from the Government's due process violations had irreparably pervaded the Government's investigation.

Accordingly, Defendants' statements to Roadrunner's counsel and in the grand jury were economically coerced in violation of the Fifth Amendment.

16

## 2.     Roadrunner's Investigation Was Fairly Attributable to the Government.

The coerced testimony obtained from Defendants is also fairly attributable to the Government. The testimony was obtained by Roadrunner's counsel at the direction and behest of the Government, as the Government dictated how and when Roadrunner interviewed its employees and when the witness interviews were downloaded to the Government. In some instances, the Government sought and obtained employees' compelled statements to prepare its interrogation of those employees in the grand jury. The Supreme Court has explained that actions such as these by a private employer may be "fairly attributable" to the government if there is a sufficiently close nexus between the Government and the challenged private action so that the private action may be fairly treated as that of the State itself.  *Blum*, 457 U.S. at 1004-05.

Here, there is little question that the Government outsourced the "important developmental stage," to Roadrunner "and then built its own 'investigation' into specific employees, such as [Defendants] on a very firm foundation constructed for it by [Roadrunner] and its lawyers." *Connolly*, 2019 U.S. Dist. LEXIS 76233, at *37. On this point, *Connolly* is instructive. There, the court held that a *Garrity* violation occurred "where [the employer] was told by the Government to conduct an investigation into a particular matter, to do so in a particular fashion, to interview particular people (including [the defendant]), to share its findings with the Government on a regular basis, and to carry out governmental investigative demands that were generated by its earlier efforts." *Connolly*, 2019 U.S. Dist. LEXIS 76233, at *44. The evidence detailed above in the Section II, setting forth communications between and among the Government, counsel for Roadrunner, and counsel for the high-ranking employees, demonstrates that is nearly exactly what occurred in this case.

17

The circumstances of defendants Wogsland and Armbruster are more troubling because they did not have the benefit of individual, independent counsel during part (Armbruster) or all (Wogsland) of the investigations. The Government undoubtedly knew this given its extensive communications and high degree of coordination with Roadrunner's counsel in connection with the witness interviews, downloads and grand jury testimony.

Furthermore, the information that the Government used to interrogate Mr. Wogsland in the grand jury was likely derived solely from Defendants' and other Roadrunner employees' compelled testimony. Between the start of Roadrunner's internal investigation and Mr. Wogsland's grand jury testimony on September 12, 2017, the Government had conducted virtually none of its own witness interviews, but it had received downloads of compelled interviews of at least 11 Roadrunner employees directly from Roadrunner's counsel. The actual number may be far greater, but is unknown at this time, because the Government refuses to provide the date on which it obtained each interview download. Defendants confidently surmise that the number is far greater than 11 because Roadrunner's counsel obtained compelled testimony from 43 witnesses spanning 63 different interviews before Mr. Wogsland testified in the grand jury.

Accordingly, sufficient evidence exists to establish that Roadrunner's internal investigation was directed by, and fairly attributable to, the Government.

### 3. The Government's Use of Tainted Testimony in the Grand Jury Warrants Dismissal.

The Second Circuit has held that dismissal of the indictment is necessary where tainted evidence was conveyed to the grand jury through the agent's testimony. *U.S. v. Conti*, 864 F.3d 63, 98 (2d Cir. 2017); *see also Harris*, 780 F. Supp. at 393. The same is true here. All of the evidence available to the Defendants indicates that evidence presented to the grand jury returning

the Indictment was necessarily tainted by the coerced statements of Defendants Wogsland and likely Armbruster (in addition to other Roadrunner employees).

From February 21, 2017, when Greenberg Traurig conducted the first known Roadrunner employee interview, to November 10, 2017, when WilmerHale conducted the last, all of the substantive testimony in the case (either from witness interviews or grand jury appearances), including interpretations of key documents that would form the basis for allegations in the Indictment, was compelled and therefore tainted. To the extent provided to the Government, it infected everything the Government did in the investigation thereafter, including its own interviews of Roadrunner employees and its presentation to the grand jury in this District. The foundation of the Government's case is rotten and cannot be repaired.

Thus, the available evidence establishes that: (1) Defendants' and other Roadrunner employees' statements made during Roadrunner's investigation and in the grand jury were coerced; (2) Roadrunner's conduct in coercing that testimony was fairly attributable to the Government; and (3) the use of that tainted testimony to return an indictment is a violation of Defendants' Fifth Amendment rights. The Indictment must be dismissed.

## C.     The Indictment Should be Dismissed Based on Prosecutorial Misconduct.

Defendants also seek dismissal of the Indictment based on the Government's misconduct, independent of its *Garrity* and *Kastigar* violations. Prosecutorial misconduct in the grand jury proceedings compels dismissal if the misconduct prejudiced the Defendants. *U.S. v. Buske*, 2010 U.S. Dist. LEXIS 77010, at *6 (E.D. Wisc. 2010) (citing *U.S. v. Anderson*, 61 F.3d 1290, 1296 (7th Cir. 1995)). "Prejudice occurs if a 'violation substantially influenced the grand jury's decision to indict, or if there is a grave doubt that the decision to indict was free from the substantial influence' of the violation." *Id.* (quoting *Bank of Nova Scotia v. U.S.*, 487 U.S. 250, 256 (1988)). Dismissal is an appropriate remedy in several circumstances relevant to this case. *See, e.g., U.S. v.*

*Jacobs*, 547 F.2d 772, 778 (2d Cir. 1976) (dismissing perjury charge based on grand jury testimony of defendant who was not warned she was a "target"); *U.S. v. Provenzano*, 440 F. Supp. 561, 565 (S.D.N.Y. 1977) (dismissing indictment based on dubious grand jury testimony and failure to introduce exculpatory evidence); *U.S. v. Samango*, 607 F.2d 877, 881 (9th Cir. 1980) (affirming dismissal based on the use of lengthy prior grand jury transcripts instead of live testimony). As discussed above, the Government's misconduct, specifically involving the misuse of coerced testimony and disregard for obvious conflicts of counsel, constituted a violation of the Defendants' Fifth Amendment rights. At bare minimum, a "grave doubt" exists as to the basis for the Indictment being free from the taint of compelled testimony.

Roadrunner's counsel obtained coerced statements from Roadrunner's employees under threat of termination and fed that compelled testimony directly to the Government. The evidence suggests that the Government did not interrogate a single Roadrunner employee in the grand jury without first obtaining at least one download of that employee's prior coerced testimony from Roadrunner. The evidence set forth above suggests that the foundation and every facet of the Government's investigation was built upon tainted evidence. Whatever was said or shown to the grand jury that ultimately returned the Indictment, there is "grave doubt" that it came from anywhere besides the Government's unconstitutional investigatory tactics.[12] Dismissal is appropriate under these circumstances.

Additionally, the abusive nature of the Government's interrogations of Roadrunner's employee warrants dismissal of the Indictment. In *U.S. v. Lawson*, 502 F. Supp. 158, 172 (D. Md. 1980), the court dismissed an indictment based on a "[p]articularly egregious" grand jury

---

[12] By this Motion, Defendants are alternatively seeking the disclosure of all grand jury material so that they can determine exactly what evidence was used to support the Indictment.

examination involving "misleading questions" and a failure to "disclose known, exculpatory evidence." The court held that those actions "denied defendants their constitutional right to an 'unbiased' grand jury." *Id.* The same outrageous conduct is present in this case. To provide the Court with one such example, Defendants have filed Mr. Wogsland's grand jury transcript under seal so that the Court can see for itself the Government's egregious questioning of Mr. Wogsland before the grand jury. (*See*, Ex. O at 67:8-72:16; 99:4-101:11; 102:1-105:23; 140:5-145:17; 246:8-254:14.)

For the foregoing reasons, dismissal of the Indictment is also appropriate based on the Government's grand jury misconduct.

    **D.**     **In the Alternative, Defendants Request a *Kastigar* Hearing, the Suppression of Mr. Wogsland's Grand Jury Testimony, and Early Disclosure of Grand Jury Material.**

Defendants submit that a sufficient record exists in this case to support dismissal of the Indictment. However, if the Court determines that dismissal is not appropriate at this time, Defendants respectfully request all of the following alternative relief.

    **1.**     **Defendants Are Entitled to a *Kastigar* Hearing To Establish That the Government's Grand Jury Evidence was Tainted or Derived From Tainted Evidence.**

Roadrunner's interviews of their employees were compelled by and fairly attributable to the Government, and therefore a *Kastigar* hearing is necessary to determine the extent to which Defendants' compelled testimony tainted the Government's investigation. In these circumstances, the Government carries a "heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Kastigar*, 406 U.S. 461-62. "The logic of *Kastigar* . . . applies to grand jury proceedings as well as to trials." *U.S. v. Palumbo*, 897 F.2d 245, 249 (7th Cir. 1990). "The government must make a 'strict showing' that the indictment was obtained independent of" the compelled testimony. *Id*. at 249. If the government cannot demonstrate that

the evidence presented to the grand jury was derived from independent sources, then the indictment must be dismissed. *Id.* at 251; *see also U.S. v. Zielezinksi*, 740 F.2d 727, 733 (9th Cir. 1984) ("We cannot permit convictions to stand where indictments are tainted"). The Supreme Court recently "affirm[ed] [] the doctrine, fully explained in *Kastigar*, that the government bears the burden of proving 'that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.'" *Cozzi*, 613 F.3d at 732 (quoting *Hubbell*, 530 U.S. at 40.) If a "compelled disclosure was the first step in the chain of evidence that led to the criminal charges against [a defendant], the prosecution violated [the defendant's] Fifth Amended privilege." *Id.* (discussing *Hubbell*, 530 U.S. at 42).

Defendants respectfully submit that the evidence presented herein is sufficient to establish that the Defendants' compelled testimony was the first step in the chain of evidence that tainted the grand jury investigation and the Indictment. The evidence of that taint will likely continue to grow as Defendants dig through the mountain of 9 million pages under which the Government has buried them. Absent a dismissal, Defendants request a *Kastigar* hearing to determine whether the Government's evidence was derived from a legitimate source, how much of the Government's investigation was tainted by the use of Defendants' compelled testimony, and whether dismissal of the indictment or further requests for suppression are appropriate.

### 2. The Court Should Suppress Mr. Wogsland's Grand Jury Testimony.

Federal Rule of Criminal Procedure 12(b)(3)(C) allows the Court to suppress evidence obtained in violation of the Constitution. As detailed above, Mr. Wogsland's testimony before the grand jury was a result of gross misconduct and abuse of the grand jury process, in derogation of Mr. Wogsland's due process rights. Mr. Wogsland was coerced to testify before the grand jury while represented by conflicted company counsel who could not provide him fair, impartial, independent legal advice. The Government understood these circumstances, and ignored the

obvious conflict of interest in violation of Mr. Wogsland's due process rights. Worse still, during its interrogation of Mr. Wogsland, the Government utilized Mr. Wogsland's previously coerced statements that it obtained from company counsel. This further tainted the grand jury testimony with the Fifth Amendment violation.[13]

As there is no testimony from that grand jury session that is free from the taint of the Government's misconduct and its *Garrity*/*Kastigar* violations, the testimony should be suppressed in its entirety. *See, e.g.*, *Conti*, 864 F.3d at 98 (a new trial "wherein any tainted statements are suppressed" would have been appropriate, if the Court did not also determine that dismissal of the indictment was necessary.) Particularly relevant to this case, "where immunized testimony is used before a grand jury, the prohibited act is simultaneous and coterminous with the presentation; indeed, they are one and the same." *Harris*, 780 F. Supp. at 390 (quoting *U.S. v. North*, 910 F.2d 843, 869 (D.C. Cir. 1990)). "There is no independent violation that can be remedied by a device such as the exclusionary rule: the grand jury process itself is violated and corrupted, and the indictment becomes indistinguishable from the constitutional and statutory transgression." *Id.*; *see also U.S. v. Hsia*, 131 F. Supp. 2d 195, 203 (D.D.C. 2001) (holding that government's sentencing arguments must be suppressed because they relied on immunized testimony and information derived therefrom).

---

[13] Adding insult to constitutional injury, the transcript of Mr. Wogsland's grand jury testimony is nearly incomprehensible. For almost seven hours, the prosecutors harangued Mr. Wogsland with run-on questions, impenetrable hypotheticals, argument, opinion and accusation. It is virtually impossible to parse any "admission" on the part of Mr. Wogsland that would be admissible at trial, and any attempt by the Government to do so would fail under the rule of completeness in any event. (*See generally* Ex. O.) Suppression would also rightfully bar the Government from improperly seeking to benefit from those violations by using Mr. Wogsland's testimony against him at trial, despite it having no evidentiary value.

### 3. The Court Should Order the Early Disclosure of All Grand Jury Material.

Federal Rule of Criminal Procedures 6(a)(3)(E)(ii) provides that "[t]he court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." It is well-settled that any indictment that is obtained by the use of compelled testimony is subject to dismissal. *See Palumbo*, 897 F.2d at 251 (indictment that was derived from compelled testimony "must be dismissed"); *see also Conti*, 864 F.3d at 98 ("[A]n indictment is subject to dismissal if it was procured on the basis of tainted evidence."); *Harris*, 780 F. Supp. at 393 (same). "If the government has presented immunized testimony to the grand jury, the indictment should be dismissed unless the government establishes that the grand jury would have indicted even absent that testimony." *Conti*, 864 F.3d at 99-100 (quotation omitted).[14]

As discussed above, good cause exists to compel the early disclosure of grand jury materials in this case. The government's investigation is built upon a foundation of employees' tainted, compelled testimony. The government abandoned the grand jury investigation in the District of Washington, D.C. in favor of a new grand jury in this District. On these facts, the Defendants are entitled to probe what information the agents, any other summary witnesses, and the prosecutors conveyed to the grand jury in this District to determine what vestiges of the Government's thoroughly tainted investigation lived on. Accordingly, the Court should order full

---

[14] Additionally, Local Rule 16(a)(3) provides, "**unless these items contain exculpatory material**, 'open file materials' do not **ordinarily** include . . . transcripts of grand testimony of witnesses who will be called in the government's case in chief." (Emphasis added.) Otherwise, Local Rule 16(a)(4) provides that grand jury transcripts will be available no later than 1 business day before the commencement of trial.

disclosure of all grand jury materials and minutes to determine whether, and to what extent, the Government used or otherwise relied upon compelled and otherwise tainted testimony in seeking the Indictment in this case.

### E. Defendants Request Leave to Seek Future Relief Based on the Outcome of This Motion, a *Kastigar* Hearing, Defendants' Motion to Compel, and Ongoing Third Party Discovery.

Defendants bring this motion now, under Rule 12(c)(3), on the deadline for pre-trial motions set by the Court. However, Defendants anticipate the potential need to file supplemental briefing or to seek additional relief as they continue to review the 9 million pages of discovery produced by the Government and after obtaining and reviewing (1) any additional discovery that the Government is ordered to produce, (2) materials subpoenaed from Roadrunner's outside law firms, and (3) any evidence introduced during a *Kastigar* hearing on the issues raised by this motion. Accordingly, Defendants request that the Court allow Defendants leave to file supplemental briefing or additional motions and/or to request evidentiary hearings on the issues raised herein as necessary, pending the ongoing review of discovery in this case.

## IV. CONCLUSION

For all of the foregoing reasons, the Court should grant Defendants Motion to Dismiss the Superseding Indictment. If the Court determines that dismissal is not appropriate at this time, Defendants respectfully request that the Court enter an Order setting a *Kastigar* hearing and related briefing schedule, suppressing any grand jury testimony of Defendant Wogsland, requiring

25

disclosure of all grand jury materials and minutes, and granting Defendants leave to file any supplemental briefing and additional pre-trial motions as necessary.[15]

Respectfully submitted,

MARK WOGSLAND

By:  s/ Ryan S. Hedges
　　　　One of His Attorneys

Ryan S. Hedges – IL Bar #6284872
Junaid A. Zubairi – IL Bar # 6278783
Jonathon P. Reinisch – IL Bar # 6317528
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 312 609 7500
rhedges@vedderprice.com

Dated:  October 18, 2019

---

[15] If the Court determines that dismissal or any of the requested alternative relief is not appropriate at the time of decision, Defendants respectfully request that the Court deny such relief without prejudice so that the Defendants may submit for the Court's consideration any additional evidence identified from the review of voluminous discovery or obtained in connection with Defendants' Motion to Compel and/or from third parties.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing motion was served on all attorneys of record in the above captioned case via the CM/ECF electronic filing system on October 18, 2019.

/s/ Ryan S. Hedges
Ryan S. Hedges

CHICAGO/#3366516